## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

RICHARD BRENNAN and        )
SAFETY STRATEGIES, INC.,       )
                                       )
        **Plaintiffs,**        )
                                       )
v.                               )        **Case No. 07-CV-0546-CVE-PJC**
                                       )
GLOBAL SAFETY LABS, INC.      )
and ARCTIC ICE, LLC,         )
                                       )
                                       )
        **Defendants.**       )

## OPINION AND ORDER

Now before the Court is Defendants' Combined Motion to Stay Proceedings and to Compel Arbitration (Dkt. # 44). Pursuant to the Court's directive at the January 4, 2008 hearing, defendants Global Safety Labs, Inc. ("GSL") and Arctic Ice, LLC ("AI") (collectively "Acquisition Parties") have refiled their combined motion to stay these proceedings and to compel arbitration pursuant to 9 U.S.C. §§ 3 and 4. Defendants argue that the claims within the complaint "arise out of and relate to a complex commercial transaction reduced to writing in numerous, simultaneously executed documents and agreements, several of which include broad, mandatory arbitration clauses." Dkt. # 44, at 1. Thus, defendants argue that these arbitration clauses extend to the claims of plaintiffs Richard Brennan ("Brennan") and Safety Strategies, Inc. ("SSI")[1] (collectively "Invention Owners"). Id. For the reasons set forth below, the Court finds that defendants' motion should be **granted in part** and **denied in part**.

---

[1]      Brennan is the president and sole shareholder of SSI. See Dkt. # 2-2, at 2; Dkt. # 53, at 29.

**I.**

This litigation arises from the commercial acquisition of intellectual property rights in certain fire suppressant products, formulas, and patented delivery systems ("Arctic Fire Products").  As part of the acquisition, the Invention Owners warranted that they were the sole owners and sole inventors of the Arctic Fire Products.  Dkt. # 2-2, at 1-2, 22-23.  They sold 100% of their ownership interest in the Arctic Fire Products to AI.[2]  Id. at 1.  In exchange, the Acquisition Parties gave the Invention Owners an up-front lump sum payment and promised subsequent additional consideration.  They also made Brennan a member of AI, Dkt. # 44, Exhibit C, at 2, part of the managing committee of AI, an advisory board member of GSL, and the "AI Division Director," Dkt. # 44, Exhibit B, at 4.  As the "AI Division Director," Brennan served as a lead consultant for AI.  See id. at 1.  A brief discussion of the relevant agreements underlying the acquisition precedes a summary of the parties' dispute.

The Safety Strategies, Inc. – Arctic Fire Commercial Agreement ("Acquisition Agreement") is the heart of this complex commercial transaction.  See Dkt. # 2-2.  At bottom, the parties' dispute turns on the question of who breached the Acquisition Agreement first.  The Acquisition Agreement contains an integration clause stating that the agreement constitutes "the entire understanding between the parties hereto respecting the transaction . . . and supercedes all prior statements, representations, communications or correspondence."  Id. at 2-2, at 34.  The Acquisition Agreement addresses potential litigation but not arbitration.  See id. ("[T]he prevailing party in any litigation or judicial proceeding instituted with regard to this Agreement shall be entitled to reasonable attorneys' fees and costs.").  The Acquisition Agreement also includes eleven, contemporaneously

---

[2]      AI is GSL's wholly-owned subsidiary.  Dkt. # 44, Exhibit C, at 2.

executed agreements attached as exhibits.  See Dkt. # 2-3.  The relevant attached agreements include

a Consulting, Product Development and Personal Services Agreement ("Consulting Agreement"),

Dkt. # 2-2, at 6, a Promissory Note, id. at 11, a Security Agreement, id., a Net Sales Agreement, id.

at 12, a Subscription Agreement, id., and a Stock Warrant, id.  The Acquisition Agreement refers

to these attached agreements as "Closing documents."  Id. at 20 ("Acquisition Parties shall prepare

and  deliver to Invention Owners for review, all Closing documents . . . including without limitation

. . . [the] Executed Copies of all Agreement [sic] and documents as [] attached hereto as Exhibits .

. . .").  Only two of these attached agreements contain arbitration provisions.

These two agreements are the Consulting Agreement and Net Sales Agreement.   The

Consulting Agreement provides in pertinent part:

> **BINDING ARBITRATION**.  Any claim or controversy arising out of or relating
> to this agreement, or the breach of it, shall be settled by arbitration, in accordance
> with the rules for Complex Cases of the American Arbitration Association.
> Judgment upon the award rendered may be entered in any court of jurisdiction [sic].

Dkt. # 44, Exhibit B, at 12 (emphasis in original).   Brennan and AI are signatories to the Consulting

Agreement.  See id. at 1.  The Consulting Agreement governs the signatories' rights and obligations

with respect to Brennan's post-closing consulting services for AI.   The Net Sales Agreement

contains a similar arbitration provision:

> Binding Arbitration Mandated.  Any claim or controversy that arises out of or relates
> to this agreement, or the breach of it, between the parties hereto, shall be settled by
> arbitration in accordance with the rules for Complex Cases of the American
> Arbitration Association.  Judgment upon the award rendered may be entered in any
> court with jurisdiction.  This provision shall not prohibit injunction [sic] and/or
> temporary relief being entered by a Court of competent jurisdiction.

Dkt. # 44, Exhibit C, at 15 (emphasis in original).  Brennan, GSL, and AI are signatories to the Net

Sales Agreement.   See id. at 1.  The Net Sales Agreement governs the signatories' rights and

obligations with respect to specific post-closing sales.

Although not attached to the Acquisition Agreement, three other agreements related to the

parties' acquisition are relevant to this inquiry.  These agreements include the Amended Operating

Agreement of Arctic Ice, L.L.C., ("Operating Agreement"), the Arctic Ice/Brennan Trust Agreement

("Trust Agreement"), and the Arctic Ice, L.L.C. Subscription Agreement ("AI Subscription

Agreement").   All three of these agreements reference the Acquisition Agreement;[3] only the

Operating Agreement contains an arbitration clause:

> In the event of any controversy or claim, whether based on contract, tort, statute, or
> other legal or equitable theory (including any claim of fraud, misrepresentation, or
> fraudulent inducement), arising out of or related to the corporate contract between
> and among [] [AI] [or] its Members . . . (as the contract is embodied under the
> Articles of Organization, this Agreement, resolutions, the Act, and the common law
> at the time of the acts giving rise to the controversy or claim) ("Dispute"), the parties
> agree
>
> . . . .
>
> (b) **Arbitration**.
>     (i) If not resolved by mediation, the parties shall resolve the Dispute by
> arbitration pursuant to this Section and the then-current rules and supervision of the
> American Arbitration Association.

---

[3]    For example, the Operating Agreement states that the allocation of income and losses is
"subject to any other written obligations for payments from AI to Brennan, including the .
. . [Promissory] Note and the . . . Congency [sic] Payment, and the Net Sales Payment." Dkt.
# 44, Exhibit D, at 3.  The Operating Agreement further states that AI may not transfer any
of the fire suppressant products, formulas, and patented delivery systems acquired under the
Acquisition Agreement until the Promissory Note and Security Agreement are "retired, paid,
and extinguished in [their] entirety."  Id. at 3-4.

Dkt. # 44, Exhibit D, at 14-15 (emphasis in original).  GSL and Brennan are signatories to the Operating Agreement.  Id. at 1.  The Operating Agreement governs members' rights with respect to AI's business operations and internal governance.  The Operating Agreement, as well as the Consulting Agreement and Net Sales Agreement, all contain integration clauses which unambiguously state that each agreement represents the entire understanding of the parties and supercedes all previous understandings, written or oral, between the parties.  See Dkt. # 44, Exhibit B, at 12; Dkt. # 44, Exhibit C, at 14; Dkt. # 44, Exhibit D, at 17.  The parties do not dispute that Oklahoma law applies to the acquisition, as set forth in the agreements' choice of law provisions.  See Dkt. # 2-2, at 33; Dkt. # 2-3, at 7, 8, 16, 23, 28; Dkt. # 44, Exhibit B, at 12; Dkt. # 44, Exhibit D, at 15.  The table below summarizes which agreements contain arbitration provisions:

| Agreement | Arbitration Provision |
| --- | --- |
| Acquisition Agreement | no |
| Promissory Note | no |
| Security Agreement | no |
| Subscription Agreement | no |
| Net Sales Agreement | yes |
| Consulting Agreement | yes |
| Operating Agreement | yes |
| AI Subscription Agreement | no |
| Trust Agreement | no |

At closing, the Acquisition Parties paid the Invention Owners $2 million in cash and agreed to give the Invention Owners additional consideration.  Dkt. # 2-2, at 11-13.  This additional consideration includes: (a) a contingency payment of $500,000 within sixty days of AI receiving $1,000,000 in gross sales from the Arctic Fire Products, (b) a final payment of $1,500,000 to be

made thirteen months after closing as represented by the Promissory Note and Security Agreement, (c) $100,000 per year, plus other business and personal expenses, to Brennan for his services as outlined in the Consulting Agreement, (d) three percent of net sales from the Arctic Fire Products pursuant to the Net Sales Agreement, (e) 250,000 common shares of GSL stock as represented by the Subscription Agreement, and (f) a Warrant to purchase 100,000 shares of GLS common stock upon the occurrence of certain conditions.  See id.  The Acquisition Parties have yet to tender the promised additional consideration.  Both sides of this dispute claim the other side breached first. The parties filed their claims in separate fora on the same day, September 28, 2007.

The Acquisition Parties filed their claims with the American Arbitration Association ("AAA"), alleging that the Invention Owners breached at closing by misrepresenting inventorship and ownership with respect to the Arctic Fire Products.  See Dkt. # 44, Exhibit A, at 8.  The Acquisition Parties claim that this failure to give full consideration constitutes a breach of the Acquisition Agreement, as well as the Operating Agreement, Consulting Agreement, Net Sales Agreement, Security Agreement, Subscription Agreement, AI Subscription Agreement, and Trust Agreement.  See id. at 8-9.  According to the Acquisition Parties, upon making the determination that "Brennan was likely not the true inventor at [sic] all or most of all of the patentable claims and ingredients," the Acquisition Parties decided "not to provide Brennan with any further value, being the GSL Stock or the AI Units or make any further payments until all disputes surrounding the inventorship and ownership" of the Arctic Fire Products is resolved.  Id. at 10.  The Acquisition Parties claim that Brennan's management of AI's Pennsylvania office and performance as a consultant qualifies as breach of the Consulting Agreement.  Id. at 12-13.  The Acquisition Parties refuse to place the collateral in trust until "the true nature and identity of the inventor and owner"

of the Arctic Fire Products are resolved.  Id. at 12.  In sum, the Acquisition Parties contend that if Brennan is not the true inventor or owner of all of the Arctic Fire Products, he is not entitled to the full $2 million paid to him at closing, and he is not entitled to all of the promised additional consideration.  Id. at 13.

By contrast, the Invention Owners filed their complaint in this Court,[4] alleging that the Acquisition Parties breached at closing by not transferring the Closing documents to a trustee as required in the Trust Agreement and the Acquisition Agreement.  Dkt. # 2, at 4, 7.  The Invention Owners claim that "the Acquisition Parties proceeded to close the [Acquisition] Agreement without the Invention Owners' knowledge or consent of the lack of a trustee to perform the agreed duties, in direct contradiction to the Trust Agreement and . . . [Acquisition] Agreement."  Id. at 4.  The Invention Owners claim that the Acquisition Parties did not deliver to Brennan the AI units, the GSL stock, or the stock Warrant upon closing the Acquisition Agreement.  Id. at 5-6.  The Invention Owners claim that these failures constitute a material breach of the Acquisition Agreement, entitling Brennan to immediate payment of the Promissory Note.  Id. at 7.  The Invention Owners further claim that the Acquisition Parties' failure to make any payment under the Promissory Note constitutes an event of default under the Security Agreement, which in turn entitles Brennan to foreclose on his security interest.  Id.

The Acquisition Parties argue that "[t]he disputes as alleged in Plaintiffs' Complaint, as well as the inextricably intertwined disputes relating to ownership and inventorship of the Arctic Fire Products, are all part of the same subject matter and transaction which was implemented through the

---

[4]     The Court cites to the original complaint because the amended complaint was stricken and has yet to be refiled.  See Dkt. # 27; Dkt. # 42.  Thus, Court will not address defendants' arguments regarding the stricken amended complaint.  See, e.g., Dkt. # 56, at 11, 14, 16.

linked agreements." Dkt. # 44, at 4.  They claim that broad arbitration clauses in interrelated agreements, as here, mandate arbitration and a stay of litigation. Id. at 9-10.  They claim that the confidentiality provision in the Operating Agreement also mandates a stay. Id. at 8.  The Acquisition Parties further claim that SSI, a nonsignatory to the arbitration agreements, should be compelled to arbitration because SSI is "inextricably involved in the entire transaction and should be subject to arbitration under such theories." Dkt. # 56, at 18.  In sum, the Acquisition Parties seek to compel the Invention Owners to arbitrate their claims, or alternatively, to stay litigation of any nonarbitrable claims while the inventorship/ownership issue is resolved in arbitration. Dkt. # 44, at 4; Dkt. # 56, at 20.

The Invention Owners, on the other hand, claim that the narrow arbitration clauses in the Consulting Agreement, Net Sales Agreement, and Operating Agreement do not extend to claims arising out of the heart of the transaction, the Acquisition Agreement, or the other related agreements. Dkt. # 53, at 7.  The Invention Owners also argue that their claims do not pertain to post-closing performance issues governed by the three agreements containing arbitration clauses. See id. at 21.  According to the Invention Owners, the Court should deny the Acquisition Parties' motion given that the Acquisition Parties, as drafters, failed to include arbitration provisions in all but three of the Closing documents and other related agreements.

The Invention Owners also offer Brennan's affidavit in an effort to raise a genuine issue of material fact.  Brennan claims that the Acquisition Parties made various assurances and representations at closing that "the arbitration requirement would not be related to the Trust Agreement and the other documents pertaining to the Acquisition Parties' rights, duties and

obligations under the Closing Consideration Agreements."[5]  Id. at 31.  Brennan claims that after receiving the Acquisition Parties' assurances, he agreed to close the transaction.  Id.  He further claims

> Before signing any of the documents, I specifically reviewed the Trust Agreement, the [Promissory] Note, the Security Agreement, and the [Acquisition] Agreement and confirmed that none of the foregoing contained an arbitration clause.  All parties understood and agreed that the [payment under the Promissory Note and the $500,000 contingency payment] would not be subject to any provision requiring arbitration as a method for resolving disputes.  It was specifically understood between the parties that the arbitration provision for resolving disputes would only apply to the [Consulting Agreement, Net Sales Agreement, and Operating Agreement].

Id.  The Invention Owners aver that this evidence raises a genuine issue of material fact regarding the parties' intent to exclude certain claims from arbitration.  Id. at 8.  Thus, the Invention Owners submit that they are entitled to a jury trial on the issue of whether the parties agreed to arbitrate claims arising under the Acquisition Agreement, Trust Agreement, Promissory Note, Security Agreement, and Subscription Agreements.

## II.

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16, sets forth "the national policy favoring arbitration when the parties contract for that mode of dispute resolution."  Preston v. Ferrer, 128 S. Ct. 978, 981 (2008); ARW Exploration Corp. v. Aguirre, 45 F.3d 1455, 1462 (10th Cir. 1995).  The question of arbitrability – whether a contract creates a duty to arbitrate a particular

---

[5]     Brennan defines the "Closing Consideration Agreements" as those agreements that "defined the financial structure, property interests and related transfers between the parties for the Arctic Fire IP/Products under the [Acquisition] Agreement."  Id.  Brennan excludes the Consulting Agreement, Net Sales Agreement, and Operating Agreement from his definition.  Id.

grievance – generally is resolved by judicial determination.[6]  Spahr v. Secco, 330 F.3d 1266, 1269 (10th Cir. 2003); Riley Mfg. Co. v. Anchor Glass Container Corp., 157 F.3d 775, 780 (10th Cir. 1998).  "However, a court may compel arbitration of a particular dispute . . . only when satisfied that the making of the agreement to arbitrate is not at issue."  Nat'l Am. Ins. Co. v. Scor Reinsurance Co., 362 F.3d 1288, 1290 (10th Cir. 2004) (internal quotation marks and citation omitted) (alteration in original).  To determine arbitrability, therefore, a court must examine first, whether a valid enforceable arbitration agreement exists between the parties, and second, whether the claims at issue fall within the scope of the arbitration agreement.  See id. at 1290.  The Court considers each of these questions in turn.

### A.

The Invention Owners challenge the making of the arbitration agreements.  They claim that the Acquisition Parties' attempt to compel arbitration of the claims in the complaint "seriously tests the veracity of the statements made by the Acquisition Parties to induce the execution of the various agreements at closing."  Dkt. # 53, at 8.  The Invention Owners contend that for the Acquisition Parties to seek arbitration now in contravention of their oral assurances "raises the specter of 'fraudulent inducement' in connection with the Agreements."  Id. at 20 n.5.  Accordingly, the Invention Owners claim that a genuine issue of material fact exists as to whether the parties agreed to arbitrate claims arising out of the Acquisition Agreement, Trust Agreement, Promissory Note,

---

[6]     Judicial determination of arbitrability is unnecessary, however, when the parties "clearly and unequivocally provide otherwise."  Spahr, 330 F.3d at 1269; Riley, 157 F.3d at 780.  Here, the parties have not clearly and unequivocally provided otherwise.  One arbitration clause even states, "This provision shall not prohibit injunction [sic] and/or temporary relief being entered by a Court of competent jurisdiction."  Dkt. # 44, Exhibit C, at 15.

Security Agreement, and Subscription Agreements.  Id. at 7-8. The Invention Owners proffer Brennan's affidavit in support of their challenge.  See id. at 8, 29.

While the Tenth Circuit has not addressed precisely the standard of review a court is to apply in deciding a motion to compel arbitration, the Tenth Circuit has intimated that a summary-judgment-like standard applies when the "making" of an arbitration agreement is at issue.  See Hardin v. First Cash Fin. Servs., Inc., 465 F.3d 470, 474-75 (10th Cir. 2006) (finding that the existence of a genuine issue of material fact regarding "the making" of an arbitration agreement warrants the denial of a motion to compel arbitration); see also SmartText Corp. v. Interland, Inc., 296 F. Supp. 2d 1257, 1262 (D. Kan 2003) (summarizing various Courts of Appeals' decisions and concluding that the Tenth Circuit would likely apply the summary judgment standard).  Ordinarily, summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993).  In the context of a motion to compel arbitration, this standard requires the moving party to present evidence sufficient to demonstrate an enforceable arbitration agreement.  SmartText, 296 F. Supp. 2d at 1263.  Once the moving party has made such a showing, the burden shifts to the party opposing arbitration to demonstrate a genuine issue of material fact as to the making of the arbitration agreement.  Id.; Avedon Eng'g, Inc. v. Seatex, 126 F.3d 1279, 1283 (10th Cir. 1997).  In deciding whether the non-movant has identified a genuine issue of material fact for trial, "the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor."  Anderson, 477 U.S. at 255.  However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no

11

'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted).

Here, the Court finds that there is no genuine issue for trial on two grounds.  First, the allegations in Brennan's affidavit are not admissible.  There are three agreements with arbitration provisions, and Brennan does not contend that those three agreements are invalid contracts.[7]  The parol evidence rule precludes admission of extrinsic evidence to vary, modify, or contradict the unambiguous terms of a contract.  Ollie v. Rainbolt, 669 P.2d 275, 279 (Okla.1983); Thrifty Rent-A-Car System, Inc. v. Toye, 25 F.3d 1058, 1994 WL 175692, at *7 (10th Cir. Apr. 19, 1994) (unpublished decision) (applying Oklahoma law).[8]  "Under the parol evidence rule, written agreements entered into by the parties supersede all pre-contract negotiations and prior oral communications." Gish v. ECI Servs. of Okla., Inc., 162 P.3d 223, 231 (Okla. Civ. App. 2006).  While "the parol evidence rule does not preclude evidence of false and fraudulent representations of fact offered to establish fraud in the inducement of the execution of a contract, even when those representations directly contradict the contract provisions[,]" First Nat'l Bank in Durant v. Honey Creek Entm't Corp., 54 P.3d 100, 104 (Okla. 2002), the Invention Owners do not plead fraudulent inducement in the complaint.  Thus, the parol evidence rule precludes admission of Brennan's affidavit to modify the unambiguous terms of the arbitration provisions in the three agreements.  All three of the agreements with arbitration clauses contain integration clauses, which unambiguously state that each agreement represents the entire understanding of the parties and supercedes all

---

[7]     What Brennan challenges is the scope of those agreements – i.e., whether they are broad enough to encompass the entire dispute between the parties.

[8]     Unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. 32.1: 10th Cir. R. 32.1.

previous understandings, written or oral, between the parties.  See Dkt. # 44, Exhibit B, at 12; Dkt. # 44, Exhibit C, at 14; Dkt. # 44, Exhibit D, at 17.  If the terms of a contract are unambiguous and the integration clause is complete, extrinsic evidence as to the intent of the parties or the nature of the contract cannot be considered.  See OKLA. STAT. tit. 12, § 2-202(b).  Because the Court has "determined the agreements to be unambiguous," the integration clauses further bar Brennan's affidavit.  Thrifty, 25 F.3d at *7.  Brennan may not use his affidavit to supplement or explain the explicit terms of the arbitration agreements.

Second, the Invention Owners cannot undermine the validity of the arbitration agreements by challenging their scope.  The Invention Owners do not dispute that three of the interrelated agreements contain arbitration provisions that are enforceable, at least with respect to claims arising under the three agreements themselves.  See Dkt. # 53, at 7, 10-11, 30.  Thus, the Invention Owners' challenge relates not to the actual making of the three arbitration provisions but to their scope as a matter of law.  The fact that these sophisticated parties (represented by legal counsel) now dispute the scope of these provisions does not raise a genuine issue as to their making.  In sum, the Invention Owners have not met their burden of showing a genuine issue of material fact as to the making of the arbitration agreements.  We now address the scope of those agreements.

**B.**

The Acquisition Parties argue that the three arbitration clauses are broad, and that they essentially extend to all contractual disputes arising out of this complex commercial transaction. They claim that the Court should not allow the Invention Owners to pursue litigation on selective portions of the acquisition to avoid the inventorship/ownership issue and to avoid arbitration.  Dkt. # 56, at 14.  They further argue that the arbitration provisions extend to the claims of SSI, a

nonsignatory.  According to the Acquisition Parties, SSI was inextricably involved in the entire

transaction and Brennan is the "real party in interest" as the sole shareholder of SSI.[9]  Dkt. # 56, at

18.

        The FAA provides that "upon being satisfied that the making of the agreement for arbitration

or the failure to comply therewith is not in issue, the court shall make an order directing the parties

to proceed to arbitration in accordance with the terms of the agreement."  9 U.S.C. § 4.  An

arbitration clause containing broad language creates a general presumption in favor of arbitrability.

Brown v. Coleman Co., Inc., 220 F.3d 1180, 1184 (10th Cir. 2000); ARW Exploration, 45 F.3d at

1462.  The Tenth Circuit has reiterated that courts should resolve all doubts and ambiguities

concerning the scope of arbitrable issues in favor of arbitration.  Nat'l Am. Ins., 362 F.3d at 1290;

Armijo v. Prudential Ins. Co. of Am., 72 F.3d 793, 797 (10th Cir. 1995); ARW Exploration, 45 F.3d

at 1462.  The presumption in favor of arbitrability "may be overcome only if 'it may be said with

positive assurance that the arbitration clause is not susceptible of an interpretation that covers the

---

[9]      Although the Acquisition Parties also claim that "courts have compelled non-signatories to arbitrate under numerous contract principles including incorporation by reference, assumption, agency, veil piercing/alter ego, estoppel, and third party beneficiary," they do not make any argument concerning any of these theories. Dkt. # 56, at 18.  It is the duty of litigants – not a court – to research arguments and submit thoughtful legal analysis.

asserted dispute.'"[10]  ARW Exploration, 45 F.3d at 1462 (quoting AT&T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 650 (1986)).  Here, it may be said with positive assurance that the Invention Owners have overcome the presumption of arbitrability with respect to that part of the acquisition not arising from or related to the three agreements containing arbitration clauses.

1.  Claims Arising Under Acquisition Agreement and Other Agreements with No Arbitration Provision

As discussed more fully below, the Invention Owners did not agree to arbitrate all claims relating to this complex acquisition simply because the Acquisition Parties, as drafters, included narrowly-worded arbitration clauses in three ancillary agreements relating to post-closing performance obligations.  The Acquisition Agreement, which is the heart of the transaction, refers to litigation and litigation alone.  Quite simply, the arbitration tail should not wag the acquisition dog.

Two distinguishable Tenth Circuit decisions inform the Court's analysis.  In ARW Exploration, 45 F.3d at 1461, the Circuit found that an identical arbitration provision contained in five of six joint venture agreements extended to the sixth joint venture agreement which did not contain the arbitration clause.  Id. at 1462.  The arbitration clause stated that "all disputes shall be

---

[10]     The Invention Owners claim that "state law principles regarding formation of contract govern" the Court's analysis as to scope.  Dkt. # 53, at 17.  The Court notes that the Tenth Circuit does not apply anything other than general FAA principles in determining scope. See, e.g., Nat'l Am. Ins., 362 F.3d at 1290-91; Brown, 220 F.3d at 1184, P&P Indus., 179 F.3d at 871-72; ARW Exploration, 45 F.3d at 1462; see also SmartText, 296 F. Supp. 2d at 1266-67.  While the Court acknowledges that other Circuits do apply state law principles in determining scope, see, e.g., Combined Energies v. CCI, Inc., 514 F.3d 168, 171 n.1 (1st Cir. 2008); Rosenblum v. Travelbyus.com Ltd., 299 F.3d 657, 662 (7th Cir. 2002); Neal v. Hardee's Food Sys., Inc., 918 F.2d 34, 37 n.5 (5th Cir. 1990), this Court declines the Acquisition Parties' invitation to disregard binding Tenth Circuit precedent.

subject to binding arbitration.  <u>Any matter in dispute which is not provided for in this agreement or in the Joint Operating Agreement shall be settled by arbitration</u> . . . ."  <u>Id.</u> (emphasis in original) (internal quotation marks omitted).  The Circuit held that the "any matter in dispute" language was broad enough to cover disputes arising out of any one of the related agreements, including the one agreement that lacked the arbitration clause.  <u>Id.</u>  The Circuit concluded that because all of the plaintiffs were parties to at least one arbitration agreement, and because it could not be said with positive assurance that the arbitration clause was not susceptible of an interpretation that covered the asserted dispute, the plaintiffs' claims were arbitrable.  <u>Id.</u>

The Circuit reached a similar conclusion in <u>National American Insurance</u>, 362 F.3d at 1292. The parties disputed whether an arbitration clause in the parties' initial, primary agreement mandated arbitration of the plaintiff's claims.  <u>See id.</u> at 1289-90.  The arbitration clause required arbitration of "[a]ny irreconcilable dispute between the parties to this Agreement."  <u>Id.</u> at 1290 (internal quotation marks and citation omitted) (alteration in original).  The plaintiff argued that its claims were not arbitrable because they stemmed from the parties' subsequent, related agreement that lacked an arbitration clause.  <u>See id.</u>  The Circuit found that the initial agreement contained "a broad arbitration clause requiring, at a minimum, that any irreconcilable dispute relating to the [initial agreement] be arbitrated."  <u>Id.</u> at 1291.  The Circuit noted that "when two agreements are at issue, one with an arbitration clause and one without, the fact that one agreement references the other supports arbitrating claims arising from either agreement."  <u>Id.</u>  The Circuit concluded, therefore, that the claims arising out of the two interdependent agreements, which were part of a single transaction, were arbitrable.  <u>Id.</u> at 1292.  Because the plaintiff, a sophisticated reinsurer represented by legal counsel, agreed to be bound by the primary agreement's broad arbitration

clause, the plaintiff was bound to arbitrate its claims stemming from the secondary, dependent agreement. Id.

Here, the arbitration provisions at issue do not contain broad language. They do not apply to "any dispute between the parties" or "any irreconcilable dispute." They apply, instead, only to disputes arising out of or relating to the agreements themselves or other specific documents. The Consulting Agreement requires arbitration of "[a]ny claim or controversy arising out of or relating to this agreement, or the breach of it[.]" Dkt. # 44, Exhibit B, at 12 (emphasis added). The Net Sales Agreement requires arbitration of "[a]ny claim or controversy that arises out of or relates to this agreement, or the breach of it, between the parties hereto[.]" Dkt. # 44, Exhibit C, at 15 (emphasis added). The Operating Agreement requires arbitration of "any controversy or claim . . . arising out of or related to the corporate contract between and among [] [AI] [or] its Members . . . (as the contract is embodied under the Articles of Organization, this Agreement, resolutions, the Act, and the common law at the time of the acts giving rise to the controversy or claim) . . . ." Dkt. # 44, Exhibit D, at 14-15 (emphasis added). The language of these provisions makes no mention of the Acquisition Agreement, the other ancillary agreements, or the transaction as a whole. The Court finds that the arbitration provisions' language is narrow and creates no doubts or ambiguities as to coverage.

Further, the Court finds that the Acquisition Agreement, which lies at the heart of this complex commercial transaction, clearly foresees litigation and litigation alone. The Acquisition Agreement specifically provides for attorneys' fees in the event of "litigation or judicial proceedings." Dkt. # 2-2, at 34 (emphasis added). Neither the Acquisition Agreement nor the majority of the numerous corollary agreements includes any language even touching on arbitration.

17

In fact, the only agreements that do contain arbitration clauses govern post-closing performance obligations.  The Consulting Agreement pertains to Brennan's services as a consultant for AI.  The Net Sales Agreement pertains to the Acquisition Parties' obligation to pay a percentage of net sales to Brennan. The Operating Agreement pertains to Brennan's and GSL's rights with regard to AI's business operations and internal governance.

The Court cannot ignore certain aspects of the acquisition that make this case unique.  The Acquisition Agreement, unlike the primary agreement in National American Insurance, 362 F.3d at 1289-90, expressly references litigation and litigation alone.  The overwhelming majority of the Closing documents, unlike five of the six joint venture agreements in ARW Exploration, 45 F.3d at 1461-62, do not contain arbitration provisions.  Moreover, as discussed above, the arbitration clauses are relatively narrow vis-a-vis the broad arbitration clauses in National American Insurance, 362 F.3d at 1290, and ARW Exploration, 45 F.3d at 1462.  In sum, where sophisticated commercial parties draft an agreement that is essential to the overall transaction, and this agreement includes (1) unambiguous language expressing an intent contrary to arbitration, along with (2) absolutely no reference to arbitration, the Court is inclined to find that narrow arbitration clauses contained in three ancillary agreements do not extend to all disputes related to the subject matter of the acquisition transaction.  The Court concludes that Brennan's claims in the complaint are nonarbitrable.

As to SSI's claims, the Court cannot compel a party to arbitrate its claims if the party is not a signatory to any arbitration agreement.  While the Tenth Circuit has not precisely addressed this

third-party issue,[11] the Circuit has reiterated that arbitration is a way to resolve disputes "– but only those disputes [] that the parties have agreed to submit to arbitration." Hardin, 465 F.3d at 475 (internal quotation marks and citation omitted). The Court finds that because SSI did not sign the Consulting Agreement, Net Sales Agreement, or Operating Agreement, SSI could not have agreed to arbitrate its claims.[12] The Court concludes that SSI's claims are nonarbitrable.[13]

2.  Claims Arising Under Three Agreements With Arbitration Provision

Those claims arising from or related to the three agreements containing arbitration provisions are arbitrable, however. The parties appear to agree. See Dkt. # 53, at 19-20. Thus, that portion of the parties' dispute related to the Consulting Agreement, Net Sales Agreement, and Operating Agreement is covered by the plain language of the arbitration clauses. The Acquisition Parties' claims for breach of the Consulting Agreement, Net Sales Agreement, and Operating Agreement are arbitrable and should be resolved by AAA arbitration.

To recapitulate, only those claims arising from or related to the three agreements containing arbitration provisions are arbitrable. Hence, the Acquisition Parties' claims for breach of the Consulting Agreement, Net Sales Agreement, and Operating Agreement are arbitrable. The

---

[11]    The Circuit has noted, however, that a nonsignatory may enforce an arbitration agreement if the nonsignatory "was, at the very least, a third party beneficiary of the Agreement." Gibson v. Wal-Mart Stores, Inc., 181 F.3d 1163, 1170 n.3 (10th Cir. 1999).

[12]    Nevertheless, the Acquisition Parties argue that SSI's integral role in this acquisition transaction and SSI's relationship to Brennan creates an exception. See Dkt. # 56, at 18. The Acquisition Parties cite no controlling authority for this argument, however.

[13]    At the end of their reply brief, the Acquisition Parties challenge SSI's standing. See Dkt. # 56, at 19. The Court notes that if defendants wish to challenge SSI's standing to assert its claims, they should do so in an appropriate dispositive motion.

Invention Owners' claims for breach of the Acquisition Agreement, Trust Agreement, Promissory Note, Security Agreement, and Subscription Agreements are nonarbitrable.

### III.

The Acquisition Parties request a stay of this proceeding pursuant to section 3 of the FAA, 9 U.S.C. § 3, pending resolution of the Acquisition Parties' claims in arbitration. The Acquisition Parties argue that "judicial economy favors staying the current proceeding." Dkt. # 56, at 20. According to the Acquisition Parties, "[i]t is widely recognized that district courts have discretion to enter a stay as to nonarbitrable claims while related claims are being arbitrated; especially where the claims are intertwined or there is a possibility of inconsistent results." Id. The Acquisition Parties also claim that the confidentiality provisions in the Operating Agreement necessitate a stay of this litigation.[14] Dkt. # 44, at 8.

The Tenth Circuit has held that a court should consider a stay of federal court litigation of nonarbitrable claims when the resolution of arbitrable claims "will have a preclusive effect on the nonarbitrable claims," particularly "if the arbitrable claims predominate over the nonarbitrable claims." Riley Mfg., 157 F.3d at 785. However, "the mere fact that piecemeal litigation results from the combination of arbitrable and nonarbitrable issues is not reason enough to stay [the] entire case." Id. "[L]itigation must proceed in a 'piecemeal' fashion if the parties intended that some matters, but not others, be arbitrated." Coors Brewing Co. v. Molson Breweries, 51 F.3d 1511, 1517 (10th Cir. 1995). Federal courts do not have to "defer to an ongoing arbitration simply because the facts and parties may be similar." Id.

---

[14]    The Acquisition Parties proffer no authority in support of their contention that a confidentiality provision mandates a stay of litigation. Dkt. # 44, at 8. Thus, the Court declines to consider this conclusory argument.

Here, the Court finds that resolution of certain aspects of the Invention Owners' nonarbitrable claims will have a preclusive effect on resolution of the Acquisition Parties' arbitrable claims.  The Invention Owners' breach of the contract claim based on the Acquisition Agreement necessarily encompasses the inventorship/ownership issue.  For example, Brennan may not be entitled to the additional consideration due under the Acquisition Agreement if he was not the inventor as promised.

Because a court also "has discretion whether to stay <u>arbitration</u> pending a judicial resolution of nonarbitrable claims[,]" <u>N. Donald & Co. v. Am. United Energy Corp.</u>, 746 F.2d 666, 671 (10th Cir. 1984) (emphasis added), this Court finds that a partial stay of all claims is necessary until the Court resolves the inventorship/ownership issue.  The inventorship/ownership issue has a preclusive effect on all claims arising under the Acquisition Agreement and any of its corollary agreements.  The parties should not be opposed, moreover, to this limited stay.  They admit that they want to avoid "the increased financial burden of litigating and arbitrating simultaneously in parallel proceedings." Dkt. # 58, at 1.  They also admit that the AAA arbitration has been voluntarily stayed since January 2008 pending this Court's arbitrability determination.  <u>Id.</u>  In light of these considerations, therefore, this Court continues that stay.

**IT IS THEREFORE ORDERED** that Defendants' Combined Motion to Stay Proceedings and to Compel Arbitration (Dkt. # 44) is **granted in part** and **denied in part**: it is granted insofar as both the arbitrable and nonarbitrable claims are stayed until the Court resolves the inventorship/ownership issue; it is denied insofar as the nonarbitrable claims in the complaint (Dkt. # 2) shall not be compelled to arbitration.

**IT IS FURTHER ORDERED** that the arbitration is stayed pending resolution of the inventorship/ownership issue.

**IT IS FURTHER ORDERED** that the parties shall submit joint proposed scheduling dates in the following format no later than June 4, 2008:

| | |
|---|---|
| Discovery Cutoff for Inventorship/Ownership Issue | _____ |
| Simultaneous Motions for Summary Judgment on Inventorship/Ownership Issue | _____ |
| Response Briefs (18 days thereafter) | _____ |
| Reply Briefs (14 days thereafter) | _____ |

**DATED** this 29th day of May, 2008.

_____
CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT